Curran, Dennis J., J.
Michele Lepkowski has moved to suppress statements she made to the police, a hearing on which was held on May 19, 2009. After reviewing the credible evidence and the reasonable inferences drawn from that evidence, I make the following Findings of Fact.
FINDINGS OF FACT
On the morning of Friday, May 18, 2007, Michele Lepkowski called the police to report that her two-year-old daughter, Raelynn, was unresponsive. Raelynn was immediately taken to the Henry Heywood Hospital in Gardner, Massachusetts where, an hour later, she was pronounced dead. An emergency room physician discovered several facial and body bruises.
Heather DiPasqale and John Conron, members of the state police, responded to the hospital where they met with the emergency room physician, viewed Raelynn’s body and spoke with members of the Gardner Police Department. Neither of them were in uniform at the time. Heather DiPasqale asked Michele Lepkowski if she could speak with her. Ms. Lepkowski agreed, and they were offered, and accepted, the emergency room physician’s office in which to confer. The two police officers and Ms. Lepkowski sat down in the modest 8’ x 10’ office; although they closed the door, they did not lock it.
They asked for, and were granted, Ms. Lepkowski’s permission to audio-record their interview. The troopers told Ms. Lepkowski that they were investigating the circumstances surrounding Raelynn’s death. They sought background information as to whether Raelynn had any childhood illnesses or recent injuries, her medical history, the events of her last day alive, the identity of those who were present during that last day and her childcare arrangements. Ms. Lepkowski was cooperative, freely answered all of these questions, and volunteered the names of all persons who were with her daughter during her last day.
I have listened to the more than six and a half hours of audiotaped interviews by the two police officers in their entirety. They evidence that, at all times, the police were conversational in tone; in no way could their conduct be construed as accusatory, confrontational or coercive. To the contrary, at all times, they were respectful and polite. By the same token, so too was Ms. Lepkowski. This was a profoundly tragic circumstance for both sides—the police, faced with what they suspected was the horrible murder of a little girl, and the girl’s mother, emotionally wrought over her loss. Faced with this plight, the police conducted themselves professionally and with great sensitivity.
DISCUSSION
The First Interview
Defendant Lepkowski now challenges the police questioning her at the hospital emergency room area down the hall from where her daughter had just been pronounced dead. But questions posed to determine threshold facts as to what happened, in order to focus investigative efforts, do not constitute interrogation. Commonwealth v. Borodine, 371 Mass. 1, 3-5 (1976), cert. denied, 429 U.S. 1049 (1977). Moreover, the question of whether Ms. Lepkowski was in custody when initially questioned by the police is summarily answered by an analysis of the four factors set forth in Commonwealth v. Sneed, 440 Mass. 216, 220 (2003), to determine whether a person’s freedom of movement was sufficiently curtailed so as to require the Miranda warning:
(1) the place of interrogation—here, a hospital—was not a custodial location;
(2) whether the police officer conveyed to Ms. Lepkowski that she was a suspect—here, there was no such evidence;
(3) the nature of the interrogation—here, no evidence was proffered at the suppression hearing that the police officer’s tone was anything other than professional; •
(4) whether Ms. Lepkowski was free to leave or asked to leave. There is no evidence as to these two considerations.
This was not a custodial interrogation; it was perfectly proper police questioning. No Miranda warnings were required; however, notably, in an exercise of caution, they were given, acknowledged and signed off on by Ms. Lepkowski. (See Exhibit 1, attached hereto.)
*442 The Second Interview
The second set of questioning, at the police station, began with five minutes of generic, non-critical introductory conversation and questioning, and was followed by the reading of her Miranda warnings to her. Thereafter, Ms. Lepkowski immediately signed a second Miranda warning acknowledgement. (See Exhibit 2, attached hereto.) After those warnings, Ms. Lepkowski answered several hours of questions.
The pathos of this scene is evident from the following excerpts.
“My daughter is dead. She shouldn’t be [dead]. I’m sorry. I’m very fidgety."
“I am so blaming myself for this.”
“I’m trying to help you guys out.”
“I’m shocked because my kid is dead.”
“[My boyfriend and I are] both unemployed. No jobs in Gardner . . . I’m depressed. [I] can’t explain my attitude.”
“I’ve had trouble dealing my everything. My daughter’s father is in jail. He sits there. No life at all. I don’t even have the balls to tell him [that his child is dead] . . . He’s sitting in jail for supposedly molesting his niece.”
“It’s not like I can go anywhere because I can’t. I’m a poor white bitch. Oh, wait. Let me rephrase that. I’m a poor white girl. Belongs fucking dead. Am I a little suicidal? Absolutely. Would I do it. No. Thinking about it? Yeah.”
“How the fuck am I supposed to come up with the money to bury her.”
“I’m probably not going to make the night. Don’t be surprised. Don’t be surprised.”
“I don’t want anyone in my miserable fucked-up life.”
“This negativity isn’t good.”
“I’m trying to be as helpful as I can and as honest as I can.”
“I’m here talking to you guys to help you guys try to figure out what the hell happened. I really am.”
There can be no doubt that Ms. Lepkowski became tired and was emotional during her interviews.
There can also be no doubt that she was not in custody: she twice asked for, was permitted, to leave the police station to smoke cigarettes, demonstrated by the following exchanges:
Lepkowski: Can I go outside for a cigarette.
Trooper Conoran: Do you want to come back. Lepkowski: I’ll definitely come back in.
And after her return, this exchange occurred:
Trooper Conoran: [Have you] had a chance to settle in. [Are you able] to talk with us a little more?
Lepkowski: [After a long pause]. Whenever you’re ready.
Moreover, the audiotaped interviews are replete with the following types of exchanges:
Trooper DiPasqale: Do you want to tálk with us? We want to talk with you.
Lepkowski: I’ll do my best.
A statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. Miranda v. Arizona, 384 U.S. 436, 478 (1968). An unprovoked or volunteered statement by a defendant is not the product of custodial interrogation. Commonwealth v. Diaz, 422 Mass. 269, 271 (1996).
I find that Ms. Lepkowski’s statements were knowingly, voluntarily and willingly made, and that such findings are made beyond a reasonable doubt.
CONCLUSION
I find that as to the first interview, no custodial interrogation occurred. As to the second, any substantive statement by Ms. Lepkowski was made directly after she received her Miranda warning, and indeed, in spite of it. Further, the state troopers’ testimony was credible, direct and candid. As such, it carries the day for the Commonwealth with regard to the defendant’s motion.
ORDER
For the foregoing reasons, Ms. Lepkowski’s motion to suppress her statements is DENIED.